# AFFIDAVIT

I, James Trader, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic device and removable media listed in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2) There is probable cause to believe that a search of the device described herein and in Attachment A will lead to evidence of violations of **21 USC 841 – Possession With Intent To Distribute -Fentanyl, Methamphetamine, Heroin, and Cocaine** and **21 USC 846 – Conspiracy to Possess With Intent To Distribute – Fentanyl, Methamphetamine, Heroin, and Cocaine,** as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3) The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation. As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the device.

4) I am an investigator or law enforcement officer of the United States within the meaning of Title 18 United States Code (U.S.C.) § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 8, Title 18, Title 19, Title 21, and Title 31 of the United States Code. I am currently assigned to the Homeland Security Investigations (HSI) office in Nogales, Arizona. I have been a Special Agent with HSI since February 2023. Prior to becoming an HSI Special Agent, I was a United States Border Patrol Agent. As part of my career as a United States Border Patrol Agent, I served as a Task Force Officer assigned to HSI Nogales.

Through those experiences I have conducted criminal investigations into violations of federal law including drug trafficking, firearm trafficking, and human smuggling.

5) As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law, including those enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code. In preparing to become a Special Agent, I attended the Criminal Investigator Training Program and the HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia. As a United States Border Patrol Agent, I attended the basic law enforcement academy at the Federal Law Enforcement Training Center in Artesia, New Mexico.

6) As part of my current duties with HSI in Nogales, Arizona, I have participated in criminal investigations involving Transnational Criminal Organizations (TCO). Pursuant to my participation in these investigations, I have performed various tasks including: (a) functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of narcotics and weapons; (b) functioning as a surveillance agent and thereby observing and recording movements of persons smuggling narcotics, weapons, illicit proceeds, and other activity in support of their illegal activities; (c) interviewing witnesses, suspects, cooperating individuals, and confidential sources relative to the illegal smuggling of narcotics, weapons, and illicit proceeds; and (d) participating in investigations involving narcotics and weapons trafficking.

7) In the course of conducting narcotics and weapons trafficking investigations, I have personally interviewed informants and persons involved in the distribution of illegal narcotics in the United States, and weapons trafficking into Mexico. I have consulted with Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) investigators concerning the practices of weapons traffickers and the best methods of investigating them. In preparing this affidavit, I have conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, I have personal knowledge of the following facts or have learned them from the individuals mentioned herein.

8) Through training and experience I know:

a) That individuals involved in criminal activities, such as drug trafficking, are commonly in communication via cellular telephones with additional co-conspirators capable of providing resources in furtherance of criminal activity.

b) That contraband smugglers maintain books, records, receipts, notes, ledgers, personal computers, cellular phones, money orders and other papers relating to the movement and storage of narcotics;

c) That large-scale narcotics traffickers often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in items a, b, and c;

d) That narcotics/firearms smugglers commonly use cellular telephones to communicate with their associates and to facilitate movement and housing of narcotics/firearms. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the narcotics/firearms trafficking associates and/or activity, all of which can be used to identify and locate associates, to identify methods of operation of the traffickers, and to corroborate other evidence obtained during the course of the current investigation;

e) That narcotics traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property, and their narcotics/firearms. That these smugglers usually maintain these photographs within their possession, in their residences, vehicles, businesses, cellular telephones, or other locations which they maintain dominion and control over.

9) Drug Trafficking Organizations (DTO) often utilize known couriers and maintain constant communication with their couriers/conspirators during the timeframe before crossing a Port of Entry (POE), throughout their destination to Tucson/Phoenix, and ultimately upon being paid or completing the task requested.

10) DTOs often use text messages to coordinate between the individuals participating in any given smuggling event.  The use of text is convenient because it is quiet, discreet,

and can be read whenever it is opportune for whomever is receiving the message. Often times, directions are sent via text. Other messaging programs that the DTOs exploit include Whats-App, WHISPER, and Facebook Messenger. They use these programs to solicit and recruit for drivers, scouts, heat vehicles, and lookouts to fill roles in the scheme. Often times, payment for these jobs are discussed on these platforms. The DTO uses these platforms because they are usually more difficult to track.

11)   Thorough examining data stored on the devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of the locations and identities of persons with which the device communicated, and communications (photographic and electronic) between members of DTOs.

12)   The large, well-established DTOs along the southwest border routinely compartmentalize their illegal operations. These DTOs employ various sub organizations or "cells," which independently accomplish such tasks as: the receipt and transportation of illegal narcotics, in and through Mexico; the importation of the illegal contraband into the United States; the storage and concealment of the illegal contraband along the southwest border in the United States; and the transportation of the illegal contraband from the southwest border to destinations within the interior of the United States.

13)   This affidavit is based on information that I personally know or learned from other law enforcement agents. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

14)   The purpose of this warrant is to search one (1) **Black Phone, (Target Phone 1)**. The property to be searched is documented on **DHS forms 6051S No. 2024260400021001 GP Group 2**, as **Line Item 0008, IPHONE**, belonging to the event **2024260400021001,** as described in Attachment A. Target Phone 1 was recovered from Guadalupe Alessandra Lujan VAZQUEZ.

15)     Target Phone 1 is currently in law enforcement custody and is being held at the HSI
        Nogales office; 41 Paseo De Yucatan, Rio Rico, AZ 85648.

16)     The applied-for warrant would authorize the forensic examination of Target Phone 1
        for the purpose of identifying electronically stored data, as described in Attachment B.

**PROBABLE CAUSE**

17)     On January 21, 2024, at approximately 9:20p.m., United States Customs and Border
        Protection Officers (CBPO) conducted inbound inspections of persons and vehicles at
        the DeConcini Port of Entry (POE) in Nogales, Arizona.  The primary CBPO manning
        the vehicle inspection lane four (4) inspected driver VAZQUEZ, Guadalupe (DOB:
        XX/XX/1996; United States Citizen).  VAZQUEZ was driving a white 2023 Nissan
        Sentra bearing Arizona license plate #SPA2MS, for which VAZQUEZ is listed as the
        registered owner.   VAZQUEZ presented her Arizona driver license for entry. The
        primary CBPO obtained a negative declaration, where VAZQUEZ denied having any
        type of contraband with her, and asked VAZQUEZ what the purpose of her trip to
        Mexico was.  VAZQUEZ stated that she had taken her dog to the veterinarian, and that
        she was now returning home to Tucson, Arizona. The primary CBPO referred
        VAZQUEZ to secondary inspection for a Z-Portal (x-ray) scan.

18)     During secondary inspection, VAZQUEZ's vehicle was scanned through the Z-Portal
        (x-ray). A CBPO, who is a certified Z-Portal operator, observed anomalies in the door
        panels, floor, and center console area of the car.  While directing VAZQUEZ to park
        the car in secondary area, the secondary CBPO noticed there was no referral slip on the
        windshield.   The CBPO asked VAZQUEZ why she was in the Z-Portal line and
        VAZQUEZ stated that the primary CBPO had made a mistake in escorting her to the
        Z-Portal line.  VAZQUEZ stated that the primary CBPO had escorted her to the wrong
        area as it was the opposite way from the exit.  VAZQUEZ stated that she took the wrong
        exit.

19)     The secondary CBPO asked VAZQUEZ for her documents, and VAZQUEZ stated that
        she did not understand the question.  The secondary CBPO asked VAZQUEZ for the
        documents she had presented to the primary CBPO. VAZQUEZ reached into her jacket
        pocket and produced her Arizona driver license wrapped in the referral slip.   The

secondary CBPO asked VAZQUEZ if she had removed the referral slip from the windshield of her car. VAZQUEZ stated "Yes." The secondary CBPO asked VAZQUEZ where she was coming from, and VAZQUEZ stated that she had taken her dog to the veterinarian. VAZQUEZ stated that she met with a male friend as soon as she crossed into Mexico because she doesn't understand Spanish and needs the male friend to translate for her. VAZQUEZ affirmed the vehicle belonged to her and stated that she was the only person who drove the vehicle. The secondary CBPO took a second, negative declaration from VAZQUEZ, meaning, she again denied having any alcohol, tobacco, firearms, and narcotics.

20) After further inspection of the vehicle, CBPOs discovered a total of ninety-one (91) packages, wrapped in cellophane, concealed in the door panels, floor and center console of the vehicle. Sixty-four (64) packages, weighing 31.44 kilograms(kg)/69.30 pounds(lbs), tested positive for the properties of methamphetamine, using a GEMINI machine. Twenty-two (22) packages, weighing 13.54kg/29.85lbs, tested positive for the properties of fentanyl using a Rapid Response Test kit. Three (3) packages weighing 2.48kg/5.45lbs, tested positive for the properties of cocaine using a GEMINI machine. Two (2) packages weighing 1.70kg/3.75lbs, tested positive for the properties of heroin using a NIK test kit L. The total weight of the ninety-one (91) packages was 49.16kg/108.35lbs.

21) Before VAZQUEZ was interviewed, Special Agents (SA) observed her cell phone ringing, from a contact named "Viejito."

22) VAZQUEZ waived her *Miranda* rights and participated in an interview, during which she stated that she wanted to take her dog to the veterinarian the following day, but her friend "Eric Lopez" needed to go to the pharmacy, and he insisted they go today. VAZQUEZ drove her vehicle to Mexico, however once in Mexico, VAZQUEZ switched roles with Eric Lopez and he drove the car. VAZQUEZ stated this was because she does not know the streets in Nogales, Sonora, Mexico. Eric Lopez drove VAZQUEZ's car to his cousin's house, where it was parked. At this house, VAZQUEZ and Eric Lopez left VAZQUEZ's car and got into another vehicle. From there, VAZQUEZ claims she and Eric Lopez went to the veterinary clinic, which was closed, then to a pharmacy, then went to eat tacos, and then drove back to the waiting line to

cross into the United States.  VAZQUEZ stated that while in line, the cousin drove VAZQUEZ's car back to her.  VAZQUEZ then got into her own car while Eric Lopez and his cousin drove away in the other vehicle.

23)     VAZQUEZ claimed she was only in Mexico for two to three hours. However, crossing history indicates her trip to Mexico was approximately five hours long, as she crossed into Mexico at approximately 4:26p.m., and crossed back into the United States at approximately 9:20p.m. When agents asked for Eric's contact information, VAZQUEZ said it was in her phone, but declined to give consent to search her phone, as is her right.

24)     VAZQUEZ admitted she did not have an appointment for her dog at the veterinary clinic. When agents noted it was odd that a veterinary clinic would be open after 5:00p.m. on a Sunday, VAZQUEZ claimed she had searched for the hours of operation on Google previously and it stated the veterinary clinic was open until 8:00p.m. VAZQUEZ admitted she did not think to check the hours before she left for Mexico that evening.

25)     Based on my training and experience, I know that ninety-one (91) packages of seized narcotics, which are concealed in the vehicle's door panels, floor and center console, would have taken an extended amount of time to load.  Furthermore, I know that a load of this size (49.16kg/108.35lbs) and being of mixed narcotics shows a high level of trust and cooperation from the DTO and driver.  Based on the above, your Affiant believes that probable cause exists to search Target Phone 1 for the items set forth in Attachment B.  Your Affiant believes that Target Phone 1 contains evidence relating to the commission of criminal offenses including possession with the intent to distribute (21 USC 841) and conspiracy to possess with the intent to distribute (21 USC 846), particularly given the quantity of narcotics in this case.

**TECHNICAL TERMS**

26)     Based on my training and experience, I use the following technical terms to convey the following meanings:

a) Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b) Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c) Portable media player:  A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d)  GPS:  A GPS navigation device uses the Global Positioning System (GPS) to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e)  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for

example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g) Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h) IP Address: An Internet Protocol (IP) address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

27) Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Phone 1 has capabilities that allow it to serve as a wireless telephone, receive and send email, instant messaging, a digital camera, and serve as a GPS navigation device.

28) Although some of the records requested in this affidavit might be found in the form of user generated documents (such as electronic format documents and picture and movie files), an electronic communication device (such as the Target Phone 1) can contain other forms of electronic evidence that are not user generated.  In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, and experience, as well as information relayed to me by law

enforcement officers, and other persons involved in the forensic examination of electronic communication devices, I know that:

a)  Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

b)  Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords; Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

c)  Computer file systems can record information about the dates that files were created and the sequence in which they were created.  This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

d)  When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created, as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

e)  The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user.  All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

f)  The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators.  Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used.  Therefore, contextual information

11

necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29)    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

30)    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Target Phone 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on Target Phone 1:

a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b)    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31)  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Phone 1 consistent with the warrant.  The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of Target Phone 1 to human inspection in order to determine whether it is evidence described by the warrant.

32)  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

33)  The Target Phone 1 has been properly stored by the United States Department of Homeland Security.  Due to the nature of wireless telephones, data contained within will remain uncorrupted when being stored for an extended period.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Target Phone 1 as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

JAMES D
TRADER

Digitally signed by
JAMES D TRADER
Date: 2024.02.16
14:31:02 -07'00'

James Trader, Special Agent
Homeland Security Investigations

13

Subscribed and sworn to before me telephonically,
on February 14, 2024.

Hon. Angela M. Martinez
United States Magistrate Judge

ATTACHMENT A

PREMISES TO BE SEARCHED

This warrant applies to the following: (1) IPHONE (Target Phone 1)

The property to be searched is documented on **DHS forms 6051S No. 2024260400021001 GP Group 2**, as **Line Item 0008, IPHONE**, belonging to the event **2024260400021001,** Target Phone 1 was recovered from Guadalupe Alessandra Lujan VAZQUEZ.

Photos of Target Phone 1:



ATTACHMENT B

The particular items to be seized from Target Phone 1 to be searched are as follows:

1.    All records on the device that relate to violations of:

- **Title 21 USC 841 – Possession with Intent to Distribute – Methamphetamine, Fentanyl, Cocaine, Heroin**
- **Title 21 USC 846 – Conspiracy to Possess with Intent to Distribute Methamphetamine, Fentanyl, Cocaine, Heroin**

a.  Any and all photographs or video depicting illicit narcotics/weapons, quantities of money, other co-conspirator(s);

b.  Any and all SMS/MMS messages, voice messages, instant messages, third-party messaging application data, telephone numbers and notes, appointment books and/or calendars and notes, to-do lists, bookmarks, electronic mail, social media accounts, financial account information, contact lists, address lists, geo-location data, or any other data concealed within the electronic device to be searched that may relate to the suspected violations of federal law listed above;

c.  Any and all records recording the planning, commission, or concealment of the suspected violations of federal law listed above; and

d.  Any and all micro-SD, memory cards or hard drives attached to or inside the electronic devices to be searched which are used as extended memory storage devices.

e.  Evidence of user attribution showing who used or owned the device to be searched at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

f.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer, smartphone or electronic storage (such as flash memory or other media that can store data) and in any photographic form.

g.  Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Smartphone.

h.  Pictures: pictures taken, received, sent, saved, and deleted;

i.   Videos: videos taken, received, sent, saved, and deleted;

j.   Audio: audio taken, received, shared, sent, saved and deleted;

k.   Electronic correspondence stored on or accessed through Target Smartphone relating to drug trafficking, to include emails and attached files (sent, received and drafter), text messages, and instant messaging logs, including those saved and deleted;

l.   Notes: all bank records, credit information, account information or other financial information and records, including but not limited to:

    1.   Types, amounts, and prices of narcotics trafficked, as well as dates, places, and amounts of specific transactions;

    2.   Types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

    3.   Any information related to sources of money or narcotics (including names, addresses, phone numbers, or any other identifying information);

m.   Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through Target Smartphone;

n.   GPS location data, including coordinates, stored on or accessed through Target Smartphone; as well as any information recording travel arrangements during the time period set forth in the Affidavit and until the present; and.

o.   Data indicating locations on maps stored on or accessed through Target Smartphone.

p.   Internet: records of Internet Protocol addresses used, and any records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

q.   Any data/information stored on Target Smartphone's subscriber identity module (SIM) card(s) or all other cards used in the storing of information in the wireless telephones, including but not limited to, any images/photographs or videos, telephone numbers, numbers called, numbers stored for speed dial, pager numbers, names and addresses,

electronically stored text messages, calling card numbers, e-mail/internet access information, and/or identifying information.